## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 1:21-cr-100 |
| | : | |
| ROBIN N'NAMDI AJANI | : | Honorable Liam O'Grady |
| *Defendant.* | : | |
| | : | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING AND ASSESSMENT OF 18 U.S.C. § 3553(a) SENTENCING FACTORS

COMES NOW, Robin Ajani, by and through counsel, and provides the Court with his position regarding the sentencing factors, and with this Memorandum regarding the Court's obligation to impose a sentence "sufficient, but not greater than necessary to comply" with the factors found in 18 U.S.C. § 3553(a). Mr. Ajani agrees that the Guideline Range is properly calculated at 0-6 months, or a period of probation. For the reasons discussed below, he asks this Honorable Court for a sentence within the Guidelines of Probation only.

### Background

On August 6, 2021, Mr. Ajani pled guilty to Count One of the Indictment for falsely pretending or assuming to be Unites States law enforcement officer, in violation 18 U.S.C. § 912. [Dkt. No. 36.]

Robin Ajani is a 56-year-old man with no prior criminal history. Born Hilson Robinson Benjamin, he changed his name on March 19, 1993, the same day he became a United States Citizen. Presentence Investigation Report (PSR) ¶ 43 [Dkt. No. 38]. Mr. Ajani was born in Antigua, before moving to the U.S. Virgin Islands. *Id*. ¶¶ 40,42. He is married to his wife, Debra Ajani, and the two share a child, Nosakhere Ajani, age 22. *Id.*

¶ 45. He also has a child from a previous marriage, Aisha Ajani, age 39. *Id.* ¶ 44. He was granted custody of Aisha after his divorce. *Id.*

Mr. Ajani graduated from High School in the U.S Virginia Islands, and while he took some classes at Florida A&M University in the "mid-to-late 80's", he did not graduate with a degree. *Id.* ¶56-57. He has completed SAP (Systems and Applications Data Processing) training and is "self-taught" in the IT field. *Id.* ¶ *Id.* ¶58, 61. With this talent and knowledge, Mr. Ajani and his wife own and run Anskiaa Group Consulting, and IT consulting company which has been in business since 2003. *Id.* ¶ 59.

Mr. Ajani currently lives in Georgia, with his wife, where they moved to be closer to family after Mr. Ajani suffered a stroke in 2019. *Id.* ¶ 46, 49. Mr. Ajani is currently prescribed Hydralazin, Amlodipine, and Rosuvastatin. *Id.* ¶ 50. The stroke has had lasting effects on Mr. Ajani and his wife has identified a "change" in Mr. Ajani after the stroke, specifically in his emotional status. *Id.* ¶ 54. Prior to the current charge, Mr. Ajani had not fully understood the scope of his behavioral changes nor had he addressed the mental health aspect. He is currently participating in mental health treatment to address any long-term effects the stroke has had on his mental health and cognitive abilities to ensure he is never in this position again. *Id.* ¶ 53.

### Argument

**A.**     **The Court shall impose a sentence sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a).**

"The court shall impose a sentence sufficient, but not greater than necessary, to comply with" 18 U.S.C. § 3553(a)'s mandates.  These include considering the "nature and circumstances of the offense and the history and characteristics of the defendant," reflecting the seriousness of the offense, affording adequate deterrence, protecting the

public, and providing necessary rehabilitation to the defendant.  18 U.S.C. § 3553(a)(1-2).

In *United States v. Booker*, 125 S.Ct. 738 (2005), the United States Supreme Court restored to sentencing judges the power to use discretion in determining appropriate sentences.  "In the wake of *Booker*, therefore, the discretion of a sentencing court is no longer bound by the range prescribed by the sentencing guidelines. Nevertheless, a sentencing court is still required to 'consult [the] guidelines and take them into account when sentencing.'" *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005) (quoting *Booker*, 125 S.Ct. at 767).  The Fourth Circuit prescribes that in light of *Booker*, "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *Id.* (citation omitted).

Mr. Ajani has plead Guilty to one count of violating 18 U.S.C. § 912. The Guidelines call for 0-6 months incarceration, or a period of probation.  After considering the sentencing factors discussed below, there is no sentencing principle that would be served by any additional sentence beyond a term of probation.

**B.**     **18 U.S.C. § 3553(a) Factors to Consider in Sentencing.**

**1.**     **Nature and Circumstances of the Offense.**

Mr. Ajani falsely impersonated a law enforcement officer on September 26, 2020. On that day he presented false credentials to airport security at Ronald Reagan Washington National Airport, which purported to identify Mr. Ajani as an FBI Special Agent. Mr. Ajani was at the airport to drop off his wife so she can attend her father's

funeral. On the way to the airport, Mrs. Ajani realized that she had left her face mask, customized to honor her late father, at home. Mr. Ajani returned home to retrieve it, went back to the airport, in an effort to give his wife the mask that meant a lot to her during this difficult time. In a moment of regrettable judgment, he chose to utilize the fictitious ID so that he can give his mask to his wife, as seen on the security footage. He waited for officers to arrive and fully cooperated once they were on the scene. Mr. Ajani did not gain access to any secured areas and his arrest was entirely uneventful.

### 2.   <u>History and Characteristics of the Defendant</u>.

Mr. Ajani is 56 years old. He has no criminal history. He was born in the Caribbean and has become a United States citizen. Along with his wife, he runs a successful IT consulting company. Mr. Ajani recently suffered a stroke, and he is still grappling with and ascertaining the long term cognitive, emotional, physical, and mental effects. Prior to this charge, Mr. Ajani has been a model citizen, husband, and father.

Those closest to him can attest to his character, as the attached letters show:

Mr. Ajani's wife, Debra Ajani writes of their marriage, now in its 24th year. Debra Ajani Letter, Exhibit 1. She writes of how her and Mr. Ajani decided to homeschool their son, Nosakhere. Mr. Ajani worked to support the family, and was also a constant and active presence in raising, Nosakhere. Mr. Ajani would ensure that Debra had time off from home-schooling and he was involved in all of Nosakhere's extra-curricular activities. Mr. Ajani's commitment to his family has been evident his entire life.  Ms. Ajani also writes that,

> More than just about anyone else in this family, I understand the seriousness of this crime. This federal charge places Robin and our entire family at risk of a fundamental disruption of the life that we have built over the last 24 years. It is still very hard for me to come to grips with what has transpired.

Robin has always prided himself on following the law and not doing anything to get himself in trouble with the law.
*Id.*

As for Mr. Ajani's behavior, "In the weeks and many months following the stroke and his release from the rehab facility it was obvious to me that my husband had changed. He acted on things without the forethought and analysis that I knew was his trademark." *Id.* In contrast to his usual thoughtfulness, "[h]is decision making became more immediate and he did not exhibit the careful analysis of situations that was his previous self." *Id.*

Mr. Ajani's son, Nosakhere writes of Mr. Ajani's reputation of unimpeachable character and sacrifice. Nosakhere Ajani Letter, Exhibit 2. Similar to his mother, Nosakhere observes that he doesn't "know if or how the stroke played a role, but I know that after the stroke [Mr. Ajani] just was not the same." *Id.* Nosakhere, like the rest of Mr. Ajani's friends and family "will do all I can to be there for him as he faces the most terrifying circumstance of his life." *Id.*

Aisha Ajani, Mr. Ajani's daughter (from his first marriage) writes with unabashed admiration for her father. Aisha Ajani Letter, Exhibit 3. She tells of the sacrifices he made growing up to support his family, how he first gave up a scholarship to Florida A&M University to support his parents and brother. Mr. Ajani would later attend Florida A&M, only to disenroll to support his children, and stepchildren. *Id.* Notably, Mr. Ajani does not dwell on these sacrifices; he does not complain nor brag about them. His children know of them only because others have told them. Aisha further states:

Your Honor, my Dad has been an amazing example of a father, a wonderful husband to my mother and to my stepmom, Debbie. He is the person I try most to emulate in my life. He taught me the important of honesty, faith in Our Creator, respect for my elders and previous generation and the value of

hard work and dedication to one's goals.
*Id*.

And regarding changes in Mr. Ajani, she notes that before he suffered his stroke in 2019,

> my Dad was quick-witted and had an impeccable memory. He was meticulous in the way he made decisions. He always told us that every decision should be well thought out and logical. But after his stroke, he seemed a bit slower in his thought process and body movements, more forgetful, not quick on his feet anymore.
> *Id*.

Mr. Ajani's incarceration would "bring tremendous hardship to all of us who rely on him for so much, including financial support and guidance." *Id*.

Wendy Isom is a friend of Mr. Ajani's and she has known him for 23 years. Isom Letter, Exhibit 4. She was "surprised to learn of these charges" because she had "always known Robin to be law-abiding, honest and truthful, even when the truth hurts." *Id.* She knows Mr. Ajani as a "man of high moral character." *Id*.  She tells of how *this past year*, when Mr. Ajani was recovering from a stroke, doing daily rehab, and defending a federal prosecution, he had his niece come live with him and his wife. His niece was having trouble with remote learning, and he took her in to help with her education with resounding success, working with her and her teachers to catch her up in school. *Id*. When he could have focused only on his own problems, he took on a serious burden to help out his niece.

Mr. Ajani's friend, Preston Boyce also writes of his tremendous character. Boyce Letter, Exhibit 5. Mr. Boyce has known Mr. Ajani since High School in the Virgin Islands. *Id*. He saw the sacrifices Mr. Ajani has made throughout his life to care for his family – and how expansively Mr. Ajani defines 'Family'. *Id.* He shares that "Robin is the backbone of for his family and for his

friends. As the sole bread winner for his family, his wife, his son, and his other daughter, and grandchildren would be drastically affected financially and emotionally. Not to mention the toll it would have on this man who has lived a life of honor and commitment, a law-abiding life of giving and sacrifice*." Id*.

### a.  <u>Age and Physical Health</u>.

Mr. Ajani is 56 years old. Though in otherwise good health, Mr. Ajani suffered from high blood pressure, which led to a stroke in October of 2019. Due to this stroke, Mr. Ajani has limited left-side mobility, and uses a cane. He has significantly decreased dexterity in his left hand. PSR ¶ 49. He is prescribed Hydralazin, Amlodipine, and Rosuvastatin.  *Id*. ¶ 50. Dr. Steven Macciocchi, one of the professionals Mr. Ajani sought out after this devastating incident, writes that Mr. Ajani continue "close neurological management" and that he have "rapid access to healthcare in the event he suffers another CVA [stroke]." Dr. Macciocchi Letter, Exhibit 6.

### b.  <u>Mental and Emotional Health</u>

Mr. Ajani also suffers from mental, cognitive, and emotional effects due to his stroke. He is working on addressing those issues with two doctors and is active in his treatment. He has no prior mental health diagnosis, nor any history of alcohol or substance abuse. *Id*. ¶ 52-54.

After this incident, which is an aberration on Mr. Ajani's life, he sought to have his questions answered as to why this incident came about. Mr. Ajani not only wanted to address his criminal charges but the underlying cause so that he can understand and address those concerns. Mr. Ajani sought treatment from two mental health professionals—Dr. Melonie Bell-Hill and Dr. Hammad S. N'cho.

Dr. Bell-Hill writes that "…he has been committed to gaining self-awareness as well as integrating the necessary cognitive and behavioral changes required to reach his optimal potential." She goes on and states that Robin "(a) has acknowledged the incident resulting in legal charges as a lapse in judgment that may have been fueled by elevated stress and impaired cognitive processing, possibly resulting from the stroke (b) has accepted that this incident is now a part of his life story, and (c) has begun to implement the necessary behavioral changes, such as setting responsibility boundaries and engaging in more self-care activities aimed to reduce stress, worry, and depression."

Dr. N'cho writes that he sees values such as honor, courage, and commitment in Mr. Ajani. Dr. N'cho letter, Exhibit 7. He continues and states that Mr. Ajani's treatment with him has focused on understanding why this incident occurred as opposed to the consequences that he inevitably will face. Mr. Ajani is focused more on deterrence and ensuring he and his family never have to be in a similar position. Dr. N'cho further goes on to say that Mr. Ajani is a "good man, a kind man, an honest man, a man who prides himself in his ability to transform relentless hard work, dedication and fair play, into success for himself and the family he adores." *Id*. Lastly, Dr. N'cho states that it is his "unreserved belief that it is not in the best interest of Mr. Ajani and Mr. Ajani's family, but more importantly, it is not in the best interest of us, his fellow citizens, to separate him from the society to which he has so richly contributed throughout his life." *Id*.

Based upon the recommendations of his therapist, he sought out a neuropsychological exam to determine what, if any, impact the stroke had on his psychological health.  Mr. Ajani was evaluated by Dr. Stephen Macciocchi who performed a neuropsychological examination. *Id*. Dr. Macciocchi found that Mr. Ajani's

"reports of experiencing poor health, feeling incapacitated and persistent neurological symptoms…are psychometrically reliable…" *Id*. Dr. Macciocchi further found that,

> Mr. Ajani does not have a history of behavior suggesting anything other than he has been a productive member of society and he continues to work productively at the current time. Moreover, based on standardized psychological metrics, he would be expected to conform to society norms and expectations and he would also be unlikely to engage in illegal behavior. **Put another way, as best as can be determined based on his self-reported history, observed behavior and personality testing, the behavior which led to him being charged with the criminal offense before the Court appears to be an aberration…**
> *Id* (emphasis added).

### 3. <u>The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.</u>

The nature and circumstances of the offense and of Mr. Ajani, as discussed above, must be balanced with imposing a sentence that reflects the seriousness of this offense, respects the rule of law, and provides a just punishment.

While the charge is an aberration for Mr. Ajani's otherwise pristine record, the events leading up to the incident paint a better story of his intentions. Mr. Ajani as at the airport with his wife, Debra. He was dropping off Debra so that she could attend her father's funeral. Mr. Ajani was racked with guilt that he could not go with her due to other obligations. Only on the way to the airport did Debra realize that she had left her homemade, customized face mask to honor her late father at home. Mr. Ajani rushed home to get it and try to get it to Debra before her flight. Due to the time crunch, she had gone past security, but only so far.  He called her and told her to try to come back out so he could give it to her. Because she had gone through the security checkpoint, the closest point to her was the side entrance to the area past security. Mr. Ajani, in an attempt to hand over the mask to her, presented the fictitious I.D. to airport security and was not

permitted through. He was asked to wait for Washington Metro Police and he cooperated. This is all confirmed through security footage provided by the Government. Washington Metro Police were informed and Mr. Ajani remained on the scene while they arrived. He spoke with them and was fully cooperative throughout the investigation. He was not attempting to exercise any duties of law enforcement (such as making an arrest), nor was he attempting to get weapons passed security. While misguided, his reason for using the ID was to get his grieving wife, enroute to a family funeral, a face mask for her flight.

Mr. Ajani had no criminal history. He has now plead guilty to a federal felony. His civil rights will be affected. His standing will be diminished. A "Google" search of Mr. Ajani's name returns this case as the second item.[1] He has spent over one year dealing with the ramifications of this offense, first a state prosecution, and then this instant matter. During that time, it has been impressed on Mr. Ajani just how serious this offense is.

**4.   To Afford Adequate Deterrence to Criminal Conduct.**

As stated above, Mr. Ajani has no prior criminal history. This is the last time he will be able to say that. Mr. Ajani is fully aware that this was his one opportunity to appear before a Court with a clean record. If there are any subsequent offenses, this is not something Mr. Ajani will be able to rely on. But subsequent offenses are unlikely. Mr. Ajani has gone his whole life without a conviction. This offense happened one year after a very serious stroke, with effects that are still being identified and addressed. But Mr. Ajani is actively working to identify and address those effects. Which is to say that this behavior appears to be aberration in a life that has otherwise been entirely lawful and,

---

[1] https://www.google.com (search "Robin Ajani") Last Accessed October 15, 2021.

indeed, admirable. The stress of arrest and prosecution, the financial toll, and a period of probation are sure to deter Mr. Ajani from future illegal conduct, and his continuing treatment to address his decision making and any cognitive or mental issues will lead to better choices in the future. Those closest to him are soberly aware of his circumstances and are standing by to support him through his sentencing and to ensure this kind of behavior never repeats itself.

### 5.    To Protect the Public from Further Crimes of the Defendant.

Mr. Ajani did not victimize any individual in the commission of this offense, nor did he intend to. While the offense is serious, the public was not meaningfully harmed by Mr. Ajani's actions. And this behavior will not continue into the future. Nothing about the allegations in this case, or Mr. Ajani's history suggest that he is violent, dangerous, or prone to victimize others. Aside from ramifications Mr. Ajani faced due to state and federal prosecutions, he also has paid a hefty fine to TSA to take further responsibility and ownership of any consequences his actions may have caused.

### 6.    The Sentencing Guidelines.

Mr. Ajani agrees that the Sentencing Guidelines are correctly calculated and call for 0-6 months' incarceration, or up to 3 years of probation. Accordingly, he asks this Honorable Court to impose a Guidelines range sentence of a period of probation only, with any terms deemed just and proper by this Court. Mr. Ajani's history of being a lawful, upstanding citizen and his strong support network of family and friends ensure that that he will not engage in any further criminal behavior.

### CONCLUSION

Because the principles of sentencing require nothing more than a period of

probation, Defendant respectfully requests that the Court order only a term of probation

as appropriate.



Respectfully submitted,


Robin Ajani
By Counsel



_____/s/_____
Farheena Siddiqui
Virginia State Bar No. 92522
Law Office of Samuel C. Moore, PLLC
526 King St., Suite 506
Alexandria, VA 22314
Email: fsiddiqui@scmoorelaw.com
Phone: 703-535-7809
Fax: 571-223-5234
*Counsel for Mr. Ajani*

## **Attachments**

1. Debra Ajani Letter
2. Nosakhere Ajani Letter
3. Aisha Ajani Letter
4. Wendy Isom Letter
5. Preston Boyce Letter
6. Dr. Macciocchi Letter
7. Dr. Melonie Bell-Hill Letter
8. Dr. Hammad N'cho Letter

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2021, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will then send a notification of

electronic filing (NEF) to the following filing user:

Nicholas Schilling, Jr.
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue

Alexandria, VA 22314
Nicholas.schilling@usdoj.gov


_____/s/_____
Farheena Siddiqui
Virginia Bar No. 92522
Law Office of Samuel C. Moore
526 King St., Suite 506
Alexandria, VA 22314
Email: bszmak@scmoorelaw.com
Phone: 703-535-7809
Fax: 571-223-5234
*Counsel for Mr. Ajani*

# EXHIBIT 1

October 5, 2021


Honorable Judge Liam O'Grady
Albert V. Bryan U.S. Courthouse
401 Courthouse Square
Alexandria, VA 22314

>*Re: Robin Ajani's Sentencing*

Your Honor:


My name is Debra Ajani. Robin Ajani is my husband. Robin and I have been a couple for over 25 years and married for 24 years.  We both grew up on the island of St. Croix in the US Virgin Islands where Robin was the friend and classmate of my older brother. After high school we both moved to the U.S. mainland and eventually reconnected after over a decade. Together we have built a life for ourselves and our children. When I was pregnant with our son, we decided that I would transition from working outside the home to being a stay-at-home mom and begin preparing to homeschool our son. As a parent it was one of the best decisions we made. It allowed us to raise our son in a supportive and safe environment while preparing him academically for his future.

Although Robin worked outside the home, he was always fully engaged in the homeschooling of our son both inside and outside our home.  Robin worked with Nosakhere in the evenings to complete his homework assignment and was always a coach or assistant for each of our son's sport activities. Robin took coaching classes in soccer, football, baseball and basketball so he could be present and participate in each activity our son chose. Robin developed into such a supportive little league baseball coach that he has received numerous tokens of appreciation from many parents of various racial and ethnic backgrounds. These tokens are some of his most prized possessions.

When I married Robin, he had just recently gained full custody of his daughter from his first marriage. Robin's dedication to being the best parent he could be is one of the qualities that drew me to him. Our daughter, Aisha, has grown into an amazing young woman with a successful career. If not for Robin's fight for custody I don't believe Aisha would have achieved the educational and professional success that she has. Robin's devotion to his children has been

unwavering. That devotion has extended to his unofficially adopted daughter and her three children. That young lady has looked up to Robin as a father figure since she was four years old and today calls him Daddy and her children call him Granddaddy Robin.

Although Robin grew up poor, as did I, his home life was filled with love and care. The family values he brought to our marriage were instilled in him by his parents. The values and principles were mostly based on his father who was a devout Christian and lay-pastor who raised his children to follow his example of living an upright life.

Robin has always taken care of his family and his extended family as best he can in every way. He has been an ever present and loving father to his children, 'grandchildren', as well as our nieces and nephews, giving guidance and encouragement as they navigate their way through life. His nieces and nephews rely on him extensively for homework help and the day-to-day challenges of young adulthood. His circle of friends may be small, but they are considered family. He is never too busy for a phone call or to visit whenever possible.

More than just about anyone else in this family, I understand the seriousness of this crime. This federal charge places Robin and our entire family at risk of a fundamental disruption of the life that we have built over the last 24 years. It is still very hard for me to come to grips with what has transpired. Robin has always prided himself on following the law and not doing anything to get himself in trouble with the law.

On September 26, 2020, my husband committed an act that he will regret for the rest of his life. He recognizes and acknowledges that his actions were wrong and unacceptable. Your Honor, I am not a doctor and I have no medical training. What I do know is the man I have built a life with over the last 25+ years. This man, my loving, caring, law abiding husband suffered a massive hemorrhagic stroke September 2019. It was serious enough for the attending neurosurgeon to speak with me about possibly needing to perform brain surgery if the bleeding in Robin's brain did not subside. Fortunately, that option was not needed.
In the weeks and many months following the stroke and his release from the rehab facility it was obvious to me that my husband had changed. He acted on things without the forethought and analysis that I knew was his trademark. Myself, friends and family had always accused Robin of "thinking too much about every decision and not being spontaneous enough" It was very clear to me that had changed after the stroke. His decision making became more immediate and he did

not exhibit the careful analysis of situations that was his previous self.

Please understand, I am not making excuses for my husband. I know what he did was wrong. I accept, as does he, that there must be punishment for what was done. I also know this man, I know his heart, I know how much he cares for his family. I know something must have affected him on that day in September 2019 to result in him committing a criminal act on federal property. Robin traveled extensively for work over the years and was very aware of airport rules and regulations. He should have known better than to do what he did on that day.

Robin has always been very caring and giving to those he loves. My dad suffered two strokes, one in 2004 and another in 2012. It became difficult for my mom to handle the day-to-day care that he needed. Robin stepped up and did the research necessary to find what options were available on the island for homecare. He arranged to have a daily homecare nurse during the hours that was most beneficial to my mom. Robin has always said to me and our children, my mom is his mom, my dad is his dad and he always treated them as such.
In 2013, my mom needed a new roof. Her roof had been damaged by a number of hurricanes over the years. Robin took it upon himself to email my 13 siblings to contribute to the cost of replacing the roof. In the end the amount collected was not even half of what was needed. Robin insisted that he and I take care of the difference, which we did.

I can list a host of different instances where he has been and still is so instrumental in the lives of his family and friends. I know he has so much more to give. I know how much this family, nuclear and extended, would be hurt if he was taken away from us for even a short period. And I cannot see how society would benefit from him being incarcerated. I know he is my husband, but I truly believe he deserves an opportunity to continue to provide the love, guidance and support to those of us who depend so much on him while serving a probationary period to atone for the mistake he made.

Respectfully yours,

*Debra M Ajani*

Debra Maudina Ajani

EXHIBIT 2

October 8, 2021

Honorable Judge Liam O'Grady
Albert V. Bryan U.S. Courthouse
401 Courthouse Square
Alexandria, VA 22314

     *Re: Robin Ajani's Sentencing*

Your Honor:

My name is Nosakhere Ajani and Robin Ajani is my father. My father has been an overwhelmingly positive force in my life. He has always told me to believe in myself in all I do. Despite his busy work schedule that required frequent travel at times he made it a priority to be present at as many of my after-school activities as possible. My father made time to get coach's training in the sports I wanted to play so he could help me as much as possible. I cannot recall him ever missing any of my weekend games whether it be basketball, flag-football, soccer or my favorite sport baseball. He actually got certified as a baseball coach and was always a member of the coaching staff while I played from T-ball through high school rec-leagues. My father has instilled in me a strong love for and devotion to family as well as a mindset to always putting in the best effort and accepting the results of those efforts.

A little over a year ago my father did something that was wrong, that was criminal and now he faces the possibility of being taken away from us, from the family he has worked so hard to support. I realize that his actions have put him in tremendous jeopardy and that his actions will affect his life from this point on. I cannot give you any reasonable explanation as to why he did what he did at the airport. He said he was trying to help my mother but given the person he has always been it still doesn't make sense to me why he would commit such an act. What I know is I will do all I can to be there for him as he faces the most terrifying circumstance of his life.

Over the years I've seen how my father selflessly assisted with care for my mother's parents as they aged and faced health issues, how he cared for my mother as she faced serious medical challenges due to cardiac issues, how he provided support and encouragement to my sister Aisha as she went through college and on into her work life. I've seen how much he loves and supports my sister Sierra and how much he loves his grandchildren and is always willing to assist them with schoolwork and anything else they need help with. My father has assisted many of my cousins with schoolwork and their relationships with their own parents. By his example my father has shown me that family extends beyond blood relatives in the way he has extended himself to care for and assist many who are not related to us by blood. That is demonstrated in his relationship with my 'bonus' sister Sierra and her children who are as much a part of our family as my sister Aisha and me. Her oldest son, my nephew, Demarian, just turned 16 years old and my father is the sole positive adult male figure in his life. I see how my father works with him to try and keep my nephew focused on doing well in school and staying out of trouble. His younger sister and brother, Xyana and Brenden, rely on their granddad for homework help and whenever they need to get out of trouble with my sister Sierra.

As I went through little league baseball my father taught me the value of service to others in the way he showed patience and concern for every player especially the ones with the least talent. He always found a way to make them feel like they were contributing to the team. I saw how patiently and diligently he worked with the ones that needed the most help even staying after practice whenever possible. He would get home from those practices dead tired, but never once did he fail to check on me and my schoolwork before going to bed.

I've been told by family members of the many sacrifices my father made for his family before I was born. I may not have been around to experience those things but based on what I've seen in the way my father has been dedicated to our family and friends it is easy to believe every one of the stories I've been told.

My father continues to recover from a stroke he suffered in 2019. His actions at the airport took place a little less than a year after that stroke. I don't know if or how the stroke played a role, but I know that after the stroke he just was not the same. I had returned to live at home in January of 2019 after being away to college since June of 2017. I can say for sure that as he was recovering, I could clearly see how he dealt with things very differently. His patient and measured approach in the way he responded to me had been replaced by more sudden responses. I can't say if it was the stroke or his disappointment in me leaving college and struggling to find a job. I do know something about him had changed.

Over the past year my father has encouraged and assisted me in finding a job and I am once again enrolled in college taking two classes per term online with Southern New Hampshire University. None of that would have happened without my father's urging and his constant reminders to me that I can be successful even if it requires taking a different approach than traditional college.

I ask you to see my father as I see him, as everyone who knows him sees him, for the kind, self-sacrificing, honorably man he has been and will continue to be. My father has lived an honorable and upstanding life and has been a value to us and to our society. This family will certainly suffer financially if my father loses his job but just as important, we would all suffer tremendously if we were to lose the person that we all lean on the most for guidance and encouragement. My father has set a standard in our family for a good father, a good husband, a good son-in-law, a good uncle, a good man.  Please show him the mercy I truly believe he has earned through the life he has lived. I just cannot see how anyone benefits from him being incarcerated. I know there must be consequences for his actions. I pray that you see fit to find a way for him to pay for what he did without him losing all he has worked so hard to build and without our entire family having to suffer along with him.

Respectfully yours,

*Nosakhere Ajani*

Nosakhere Ajani

# EXHIBIT 3

October 6, 2021

Honorable Judge Liam O'Grady
Albert V. Bryan U.S. Courthouse
401 Courthouse Square
Alexandria, VA 22314

    *Re: Robin Ajani's Sentencing*

Your Honor:

My name is Aisha Ajani, Robin's daughter, and eldest child. I think the world of him and as I reflect on all he has done for me, my siblings, and others that he loves I cannot help but to hold him in high regards. When my Dad was in high school, grade 11, his father suffered a massive stroke that left him paralyzed and unable to return to the construction work he previously did.  My Dad's mom started selling candy and snacks out of their home to try to make ends meet. My Dad, being the eldest male, started working after school every day and on weekends. He continued doing so through graduation from high school. He would slip money into his mother's makeshift till to help her out. She would get excited thinking she was selling lots of candy and snacks, when, in reality, she wasn't. That's the kind of person my Dad was at that young age.

My Dad was awarded a full-ride scholarship from Florida A&M University based on his grades and test scores but did not take advantage of that opportunity. Instead, he tossed away the paperwork when it arrived and decided to stay at home and continue working to support his father, mother and brother who was eight years his junior. It wasn't until three years later, with the frequent urging of his father, and when his mother finally got employed that he went off to college albeit without a scholarship.  By this time, I had been born.

My father could have chosen to enjoy the life of the average college student especially given the sacrifices he had already made over the previous 4+ years. Instead of living his life and enjoying what most would say are the best years of an adult's life – college, my Dad sent for me and my Mom to come live with him in Tallahassee, Fl. They would later get married.

That decision set in motion events that have defined my life. But he didn't stop there. My Dad insisted that my Mom send for my two brothers (who were not his biological children) because he did not want me to grow up not having a bond with them. He voluntarily took on the extra responsibilities to feed, clothe, teach, and love my brothers as much as he loved me. He tried his best to do so while still attending school and working at fast food restaurants. Eventually that became too much for him and he made the sacrifice of giving up his dream of a college degree, and of making his father proud, so he could take care of me and my brothers. He was there for all of us, and he sacrificed so much for us. We would not have the lives we have in this country without the tremendous sacrifices made by my Dad.

I would not know of any of this if I had not been told of it by my uncle and auntie, Daddy's younger brother and older sister. He is not the one to talk about the sacrifices he has made for others.

My parents' marriage ended in divorce when I was 11 years old, and I was heart-broken. My Dad was no longer living with us and although I got to spend every weekend with him, I missed our daily interactions. After nearly two years of legal back and forth my father was awarded full custody of me. That remains one of the happiest days of my life.

A few years later my Dad would marry my stepmom Debbie which eventually led to the birth of my younger brother Nosakhere. I am 16 years older than my brother and that gap in years has allowed me to see firsthand the kind of father and husband my Dad truly is. I have observed in amazement as he helped to mold my brother into the young man he is today. My Dad would go out of his way to get home from work to help my stepmom with homeschooling. He would do everything he could to be present for Nosakhere's extracurricular activities. He would take time off from work to allow my stepmom to take vacations with her best friend so she could decompress from the stress of homeschooling. As I completed high school, then college and returned to live with my parents for a few years I got to see the man my uncle and auntie spoke of so highly in action. I got to watch, firsthand, as my Dad set the example for what I should look for in a man.

Your Honor, my Dad has been an amazing example of a father, a wonderful husband to my mother and to my stepmom Debbie. He is the person I try most to emulate in my life. He taught me the importance of honesty, faith in Our Creator, respect for my elders and previous generations and the value of hard work and dedication to one's goals.

I understand fully the seriousness of the charge he faces and that what he did was totally wrong. I cannot say what caused him to act as he did on that day. I do know how much he regrets what he did and that there is no way he would ever again engage any illegal act. The values and standards that he has instilled in his children allow me to say that with no doubt whatsoever.

What I know is that before he suffered his stroke in 2019 my Dad was quick-witted and had an impeccable memory. He was meticulous in the way he made decisions. He always told us that every decision should be well thought out and logical.  But after his stroke, he seemed a bit slower in his thought process and body movements, more forgetful, not quick on his feet anymore. His work, which was something that had come fairly easy for him became much more of a struggle. From having to type with just one hand to not resolving issues as quickly as he used to.

As a family, my stepmom, my brother Nosakhere and I were able to assist him getting around while he re-learned how to do basic things like stand on his own and walk. He has had several falls at home resulting in injuries to his left arm.

Despite all of this he has pushed through to continue working to provide for the family as he always has. Although he still requires a bit of support with his physical rehabilitation he will sit at his desk for as long as it takes to get his work done. What used to take 6 to 8 hours now

takes him 10 to 12 hours and more, but he gets it done so he can earn the income necessary to support my stepmom, my brother and others who also depend on him.

Sending my Dad to jail would bring tremendous hardship to all of us who rely on him for so much including financial support and guidance. I plead with you to see it fit to grant him a sentence that allows him to continue working, to continue being that tower of strength that he is to this entire family.

Respectfully yours,

*Aisha S Ajani*

Aisha Safiya Ajani

# EXHIBIT 4

Wendy G. Isom
9054 Hamilton Court
Jonesboro, GA 30238

September 30, 2021

Honorable Judge Liam O'Grady
Albert V. Bryan U.S. Courthouse
401 Courthouse Square
Alexandria, VA 22314

   *Re: Robin Ajani's Sentencing*

Your Honor:

My name is Wendy Isom and I have known Robin Ajani for 23 years. Robin and I worked together for about 2 years and we quickly became friends. I met his family at a company sponsored outing and our families developed a loving relationship outside of work.

I understand that Robin is facing a federal felony charge which I know is a very serious offense. I was surprised to learn of these charges because I have always known Robin to be law-abiding, honest, and truthful, even when the truth hurts.

Robin and Debbie have been a glowing example as excellent parents and a source of advice and instruction for me and my family for the past two decades. Robin has been foremost in insisting that all the children in his sphere of influence (his children, grandchildren, nieces, nephews and the children of his friends) exhibit respect and good discipline at all times. He established himself as a beacon of fairness who acted consistent with the principles he espoused. Because of this, Robin has been the go-to person for most of us when we have faced challenging circumstances and decisions.

When my children were caught in lies as teenagers, "Uncle Robin" always told them that the one thing that would ruin their relationship with the people that they loved was to tell lies. He insisted that they always told him (and us) the truth.

When my older daughter dropped out of college, Robin was instrumental in getting her to reconsider and eventually re-enroll in community college. He was able to get through to her when neither her father nor I was able to. As my younger daughter transitioned from college graduate to the working world, Robin's guidance and advice have been and remains a valuable resource to her and to me.

For the 23 years that I have known Robin, he has always been a man of high moral character. He is a hard-working and fair man. He has mentored my children and the children of other family &

Scanned with CamScanner

friends. Just this past school year, one of his nieces fell behind in her schoolwork and was at risk of not being able to graduate high school. The virtual learning experience was not working for her. Robin and his wife allowed this niece to come live with them during the second half of the school year so that they could help get her back on track. I saw him personally speak with her teachers to arrange for her to turn in missed assignments. I saw him helping her to study and encouraging her to put in the effort necessary to complete the late assignments as well as the current assignments and projects. This ultimately led to her graduating on time with the rest of her class.

Robin did this while working remotely on his current job, doing his daily rehab as he continues to recover from the stroke he suffered in 2019 and dealing with the stress of the legal matter he now faces. This is the person I know him to be, a dedicated and selfless father, husband, and friend.

I don't think that sending Robin to jail would be beneficial to society. He is the Patriarch of his family and the only one providing financial support. The financial support extends to his son who is currently enrolled in college, his 'surrogate' daughter, who is a single mother of 3, and his mother-in-law, who lost her husband in 2020.

His 'surrogate' daughter is a young woman whom Robin met when she was just four years old. At the time she was being raised by a single mother who was a friend of Robin and his first wife. Robin took it upon himself to become a father figure in that girl's life and today she calls him Daddy and her children call him Granddaddy. He is the only 'grandparent' who is active in the lives of those three children. He chose to step in as a father figure to that little girl at a time in his life when his current career was not yet established, while raising his own daughter and two stepsons and when his own family's finances were stretched thin.

Sending him to jail would take away the financial support that they all now depend on, not to mention the emotional support that he provides to so many more, including myself. When I lost my brother unexpectedly this past 4th of July, it was his listening ear and words of encouragement that helped me get through some really tough moments.

I can confirm that in the 23 years that I have known Robin Ajani, he has been a reliable, trustworthy, fair and decent person. I pray that you will give him a chance to prove that he is worthy of a second chance.

Respectfully yours,

Wendy Isom

# EXHIBIT 5

October 5, 2021

Honorable Judge Liam O'Grady
Albert V. Bryan U.S. Courthouse
401 Courthouse Square
Alexandria, VA 22314

*Re: Robin Ajani's Sentencing*

Your Honor:

My name is Preston Boyce and I first became aware of Robin Ajani in high school in St. Croix, US Virgin Islands where he was a classmate of my older sister. I didn't really know him at that time. We both ended up at Florida A&M University in Tallahassee, Florida where I was officially introduced to him. It wasn't long before a genuine friendship developed between us. Over the past thirty-five years that friendship blossomed into a true brotherhood. My children call him uncle Robin and his children call me uncle Preston.

During his first marriage I watched as Robin sacrificed his dream of a college education to fulfill his obligation as a father to his daughter Aisha while also taking on the responsibility of two stepsons, Stephen and Anthony, the children of his first wife.

When the boys were in elementary school in St. Croix their home situation resulted in them failing in all their classes and repeating grades. With Robin's insistence and active participation their mother was able to get custody and relocate the boys to Tallahassee. After trying to juggle multiple jobs and school Robin made the difficult decision to forego school to devote more time to working daily with those boys to get them caught up at grade level. Those boys became model students within a year and a half of their arrival. This sacrifice is more significant given that Robin was clearly the best student among the dozen or so of us that came from the Virgin Islands to attend FAMU during that period.

Robin has been no less influential in the lives of my own children and the other young people whose lives he has touched. This includes his 'other daughter' Sierra and her three children. When they met Sierra was the daughter of a family friend, a single mother. Robin recognized the need for guidance and didn't hesitate to fill that void. Sierra came to look to Robin as a father-figure. She still calls him Daddy to this day and her three children call him granddad. Outside of their mother, Robin is their main source of support in many ways including financially, for homework, and for overall guidance.

Everything Robin does is done with great effort to deliver a successful outcome. Delivering optimal outcomes has been his specialty on the many work projects he has been on over his career. A career built on self-taught expertise that has allowed him to become a subject matter expert in his field. However, if one would think that he works so hard for those outcomes at work, you would be amazed to see the time, effort and energy he gives to his family and close

friends. Taking care of his family has always been his main purpose in life. He is willing to show up no matter where you are, no matter the circumstances, if he feels like you need his support.

I watched as Robin fought for and won custody of his daughter Aisha after divorcing his first wife. With his guidance Aisha attained her degree and is now a successful professional currently working as a consultant on a project with the Department of Veterans Affairs in Washington D.C. His son Nosakhere, who lives at home with his parents, is currently a parttime student while holding down a job. Robin and his wife Debbie are the supportive and nurturing parents that all children deserve.

Robin has always been a hard worker, a disciplined and thoughtful person, fair, self-motivated and driven, committed to his family and friends, a spiritual, compassionate husband, father and friend. I am proud and honored to have him as my best friend, as my brother.

As much as I understand the seriousness of the charge brought against Robin, he understands the gravity of what he is facing even more so. Being charged with a federal offense with possibility of years behind bars cannot be minimized in any way. I do understand that many federal convictions result in all or almost all of the sentence being served. It would be unfortunate if Robin had to serve time in prison. He has lived his whole life avoiding circumstances that could result in this outcome. As the sole bread winner for his family, his wife, his son, his 'other daughter' and grandchildren would be drastically affected financially and emotionally. Not to mention the toll it would have on this man who has lived a life of honor and commitment, a law-abiding life of giving and sacrifice. Incarceration would absolutely break him emotionally and psychologically.

I would love to say that I would be able to offer financial support to Robin's family if he were to be confined but that is not the case given my financial situation at this time. I can provide emotional support, telephone conversations, even visiting him, but I realize that doesn't help pay the bills.

A personal experience I can share that gives insight into Robin's character is when I was about to face foreclosure on a condo I owned. With much hesitation, I told Robin the circumstances of my situation. His response was "how can I help?" He made me feel comfortable sharing my problem with him and letting me know that he would assist me as much as he could. He never hesitates to offer his help to those of us fortunate enough to call him a friend whenever we are in need.

Sending Robin to prison would truly be a disservice to his family and his community. Robin is the backbone for his family and for his friends. He is that one person everyone turns to for advice. He is always willing to give you the time you need to talk about anything. He is that one person that will show up when he tells you he will.

On his job, he stays current with new technologies by constantly studying to maintain his status as a Subject Matter Expert. His peers depend on him for his expertise and his guidance.

Whatever community Robin has lived in he has been very much involved. He has served on his HOA board, he has been a member of his neighborhood watch group, he has coached little league baseball, soccer and flag football. He has helped elderly neighbors with lawn care and

snow removal. He has participated in annual fundraisers for the American Diabetes Association Foundation and the National Multiple Sclerosis Society for years until his stroke and annually donated to Goodwill and the Central Union Mission homeless shelter in Washington D.C.

I personally know how devastating it would be to this family for my brother to be taken away from us for any length of time. This family would struggle tremendously to deal with the financial loss not to mention the emotional and psychological pain we would all face in his absence. I pray there is a means of restitution for his actions that is available that will allow Robin to pay his debt while continuing to provide for his family and continue being that beacon of support he has always been to many of us.


Respectfully yours,


Preston L. Boyce

# EXHIBIT 6



**ATLANTA NEUROPSYCHOLOGY LLC**
Stephen N. Macciocchi, Ph.D. ABPP
Board Certified in Clinical Neuropsychology
American Board of Clinical Neuropsychology
P.O. Box 189
Marble Hill, Georgia 30148

September 28, 2021

Farheena Siddiqui, Esq.
Law Office of Samuel C. Moore, PLLC
526 King St., Suite 506
Alexandria, VA 22314

Re: U.S. v. Robin Ajani

Dear Ms. Siddiqui:

You requested I perfrom a neuropsychological examination of your client in order to determine whether he has residual impairments related to his 10/6/2019 cerebrovascular accident (CVA). Medical records (Michael E. Cohen, MD) document Mr. Ajani experienced left hemisensory loss and paralysis secondary to his CVA on 10/6/2019, which resulted in him being admitted to Mary Washington Hospital for treatment. He was hospitalized for 4 days and subsequently treated for his sensory and motor impairment at Encompass Rehabilitation Hospital from 10/10 to 10/25/2019. An initial neuroimaging study (MRI) completed on 10/7/2019 revealed Mr. Ajani had a right thalamic hemorrhage accompanied by edema and a mass effect. A second neuroimaging study (MRI) conducted on 6/30/2019 revealed resolution of the hemorrhage, edema and mass effect., although "Wallerian degeneration" (residual parenchymal damage) was observed according to James Schuster, MD.

We examined Mr. Ajani on 9/18/2021. In addition to a record review and clinical examination focused on persisting symptoms secondary to his CVA, Mr. Ajani was administered neurocognitive and psychological health measures. At the time of his examination, Mr. Ajani was prescribed 3 medications, including Hydralazine (50 mg TID), Amlodipine (10 mg) and Rosuvastatin (40 mg). Mr. Ajani reported experiencing persisting motor impairment, principally paresis (weakness) and tremor involving his left upper extremity as well as weakness in his left lower extremity, which caused observable balance and endurance limitations. He also reported experiencing cognitive inefficiency.

When examined, Mr. Ajani was pleasant, cooperative, alert and oriented. His speech was fluent and his communication skills were unimpaired. Mr. Ajani evidenced observable non-dominant (left) motor tremor and fine motor speed and dexterity testing revealed his left upper extremity motor function fell at the 1st percentile for men his age. In other words, his motor impairment is severe enough to negatively impact his functional skills. For instance, he cannot effectively use his left arm or hand to normally complete some activities of daily living as well as some work-related tasks such as typing. His lower extremity weakness and balance problems also have

functional implications such as an increased risk for falls and associated brain trauma, which would most likely environmentally driven [1,2]. Fatigue following CVA is common and when fatigued, Mr. Ajani's upper and lower extremity motor limitations would become more apparent and limiting.

As part of his neurocognitive assessment, Mr. Ajani was administered 9 performance validity (malingering) metrics to determine whether his neurocognitive test performance was optimal and reliably reflected his current functioning. Mr. Ajani had no impaired performance validity test scores and his performance on neurocognitive measures also was not impaired in any domain, including verbal, perceptual, working memory, processing speed, executive, language or memory skills, at least based on age and education norms. Put another way, Mr. Ajani did not attempt to appear impaired on neurocognitive tests and his test performance was normatively unimpaired.

Mr. Ajani's psychological health assessment (MMPI-2RF) revealed he has background stressing traditional societal values, which is apparent when interacting with him. He did not evidence elevations on any symptom validity (over-reporting) scales, which means he did not report non-credible somatic, cognitive or neurological problems. In other words, his reports of experiencing poor health, feeling incapacitated and persisting neurological symptoms on the MMPI-2RF are psychometrically reliable and consistent with his self-report during his clinical examination. Finally, during clinical examination, Mr. Ajani evidenced pathological affect (emotional lability), which is characterized by rapid onset of tearfulness, principally related to his loss of functional, especially motor skills, secondary to his stroke. Such emotional lability is common following CVA and can be treated with medication, although Mr. Ajani has not been prescribed any medication for his emotional lability.

Mr. Ajani's educational and occupational history as reported reflects sustained education and employment over the past 30 years. He was born in the U.S. Virgin Islands where he attended high school and then once coming to the United States, he attended Florida AM University for 2 years. He has worked continuously in numerous technical positions over the past 25 years, including being an employee or consultant for the Florida Abuse Registry, Tallahassee Health and State Rehabilitative Services, the Leon County School Board, Coca Cola, Hewlett Packard, Mars, SAP, IBM and most recently the Defense Logistics Agency (2018-2021), principally, but not exclusively in information technology. Employment records were not available for review, but absent any contradictory evidence, Mr. Ajani has been an occupationally productive American citizen for decades. Moreover, according to Mr. Ajani, he has never been charged with a criminal offense until most recently related to the events that transpired on September 26, 2020, which ultimately resulted in him being charged with "falsely pretending or assuming to be an officer or employee acting under the authority of the United States or any department, agency, or officer thereof, and acting as such, in violation of 18 U.S.C. § 912".

In consulting with your client, I am sure you have discussed the circumstances leading up to and following the events that ultimately resulted in Mr. Ajani being charged with the criminal offense now before the Court. There are a number of contextual personal and family matters that are relevant for understanding his behavior on the day of his alleged offense, which I'm sure you also have discussed with Mr. Ajani. In addition, based on my assessment, Mr. Ajani does not have a history of behavior suggesting anything other than he has been a productive member of society and he continues to work productively at the current time. Moreover, based on standardized psychological metrics, he would be expected to conform to societal norms and expectations and he would also be unlikely to engage in illegal behavior. Put another way, as best as can be determined based on his self-reported history, observed behavior and personality testing, the behavior which led to him being charged with the criminal offense before the Court appears to be an aberration, which you can fully address with the prosecution.

Regarding Mr. Ajani's neurological health, he does not evidence neurocognitive impairment related to his stroke that would negatively impact his ability to understand the nature of the charges against him or assist you in his defense. While he does not have psychometrically reliable, residual neurocognitive impairment, he does have residual motor impairment that increases his risk for falls. Given Mr. Ajani's age, prevalent family history of CVA and documented CVA, he would be expected to require continued close neurological management and rapid access to healthcare in the event he suffers another CVA. As a neuropsychologist, I cannot fully address his medical risk factors for a future cerebrovascular event, but discussion of various risk factors is discussed in the articles referenced below [3-4]. In any case, you should consult his attending physician for an opinion regarding his current neurological risk factors and methods for optimizing his neurological health going forward.

Parenthetically, after examining many defendants and working with prosecutors over the past several decades, I have been exposed to many persons who have been charged with and some of whom have eventually been convicted of various federal crimes from fraud to felony murder, but I have not examined a more estimable defendant than Mr. Ajani, especially given his ethnic beginnings, U.S. societal acculturation and occupational achievements. I will be available to answer any questions you may have regarding my assessment and if in the unlikely circumstance the prosecution would like to speak with me about Mr. Ajani's assessment, which I have done in some prior cases, I would be pleased to do so with your permission. You have my vita and you may reach me at my office via phone (404-556-0752) or by email at snmphd@windstream.net.

Sincerely,

Stephen N. Macciocchi, PhD, ABPP
Member, Atlanta Neuropsychology

1.  Ashburn, A., Hyndman, D., Pickering, L. Yardley, L. and Harris, S. (2008) Predicting people with stroke at risk of falls, Age and Ageing, 37: 3, 270–276.

2.  Risk Factors for Falls in Community Stroke Survivors: A Systematic Review and Meta-Analysis, Xu, T., Clemson, L., O'Loughlin, K., Lannin, N., Dean, C. and Koh, G. (2018) Archives of Physical Medicine and Rehabilitation, 99:563-73.

3.  Boehme, A. K., Esenwa, C. and Elkind, M. (2017) Stroke Risk Factors, Genetics, and Prevention Circulation Research. 2017; 120:472-495.

4.  Gonzalez-Perez, A., Gaist, D., Wallander, M., McFeat, G. and Garcia-Rodriguez, L. (2013) Mortality after hemorrhagic stroke: Data from general practice (The Health Improvement Network) Neurology, 81 (6) 559-565.

# EXHIBIT 7



Honorable Judge Liam O'Grady
Albert V. Bryan U.S. Courthouse
401 Courthouse Square
Alexandria, VA 22314

October 25, 2021

Re: Robin Ajani's Sentencing

This letter has been written on behalf of Robin Ajani (Date of Birth: 09/06/1965). Since June 2021, I have provided individual psychotherapy to Robin to address his presenting concerns involving anxiety and depression. Throughout this therapeutic experience, Robin has been consistent in attending therapy sessions punctually and regularly. Additionally, he has been committed to gaining self-awareness as well as he has been committed to integrating the necessary cognitive and behavioral changes required to reach his optimal potential. As his therapist, I have had the honor of learning about the most personal, intimate parts of Robin's life. I have witnessed his unyielding respect and admiration that he has had for his now deceased father. Such respect and homage of his father has served as a guiding force in Robin's life and has fueled his decision-making where he has continued to strive to be an honorable and responsible man emulating the example set forth by his father.

This commitment to living an honorable life facilitated his ability to acquire a college education in the United States after migrating from Antigua. It also fueled his ability to be an effective father at a young age, sustain a healthy marriage for several years, and build a successful information technology consulting business. His continuing desire to live an honorable life mitigated any previous involvement with the criminal justice system until the recent, unfortunate incident where he is now awaiting trial. His current involvement with the legal system has been quite traumatic for Robin as it has caused him to question himself and has resulted in bouts of depression and anxiety. While this journey of navigating his legal charges has been emotionally difficult, it has also created an opportunity for Robin to reevaluate his life. For so many years, Robin has been the central conduit of information, resources, and support for many people in his life. Although he has prided himself to be able to serve in this role, he has become more aware of the stressful nature of sustaining this level of responsibility. Through this therapeutic

process, a healing and growth process has happened for Robin where he (a) has acknowledged the incident resulting in decreased cognitive functioning and the ability to recover from impaired cognitive processing, possibly resulting from the stroke (b) has accepted that this incident is now a part of his life story and (c) has begun to implement the necessary behavioral changes, such as setting responsibility boundaries and engaging in more self-care activities aimed to reduce his stress, worry and depression. Indeed, Robin's remorse and self-blame regarding this incident has been witnessed.

Undeniably, if given the opportunity to live his life as a free man, Robin will only continue to grow from this incident, be a better version of himself, and will continue to honor the legacy of integrity, solid work-ethnic, and general kindness set forth by his father as I know that is his life's mission.

Thank you for allowing me to share my impressions and analysis of Robin Ajani. I ask that you consider this information as you deliberate over a decision regarding his sentencing.

Respectfully yours,

Dr. Melonie Bell-Hill
Licensed Psychologist, State of Georgia
License #: PSY 002760
Owner, Behavioral Management Group, LLC

# EXHIBIT 8



# N'CHO BEHAVIORAL GROUP

Sandtown Professional Park
5835 Campbellton Rd. SW
Suite 102
ATLANTA, GA 30331
(404) 496-8699 (office) (404) 941-7556 (fax)
hammad.ncho@nchobehavioralgroup.com
NchoBehavioralGroup.com
October 25, 2021

Honorable Judge Liam O'Grady
Albert V. Bryan U.S. Courthouse
401 Courthouse Square
Alexandria, VA 22314

        *Re: Robin Ajani's Sentencing*

Your Honor:

I am a licensed psychologist and have been providing regular care to Mr. Robin Ajani since June of 2021.  Over the course of my career I have had the opportunity to serve as a clinical psychologist and officer in the United States Navy. I completed residency at Walter Reed National Military Medical Center in Bethesda, Maryland and went on to serve the Navy as a fleet psychologist and eventually, as Assistant Division Officer over the Warrior Recovery Services Clinic at Naval Medical Center Portsmouth in Portsmouth, Virginia. I tell you all of this because for a period of my life, I served, and served alongside, sailors and marines who, like I, were all driven, shaped and guided by three bedrock principles: Honor, Courage and Commitment.  As a result of my time in uniform, I know what an individual who shares these core values looks like, feels like – I believe Robin Ajani to be such an individual.

In therapy, we've discussed a life dedicated to hard work, focus, and family provision which compelled him to make the most of every opportunity this country presented him. Upon immigrating to the United States from the U.S. Virgin Islands, he excelled academically and was awarded a scholarship to attend Florida Agricultural and Mechanical University where he studied Business Administration. Mr. Ajani later furthered his education in the field of Information Technology, and became a Systems, Applications and Products (SAP) subject matter expert and ultimately, a consultant to a wide range of corporations, and an independent contractor with the Department of Defense. Mr. Ajani frequently expresses an almost palpable level of pride at his "only in America" journey from humble beginnings in the Caribbean to now being afforded opportunities to contribute to the effective operation of the nation he very clearly loves.

Much of our work together has revolved around the ongoing psychological and emotional ramifications of the debilitating hemorrhagic stroke he suffered on October 6, 2019. Mr. Ajani frequently describes feelings of shame and an impaired sense of self resulting from the paralysis he initially experienced on the left side of his body that has left him with diminished function of his left hand and requiring a cane to aid his mobility. While we have of course discussed the incident that occurred at Ronald Reagan Washington National Airport on September 26, 2020, interestingly, his focus has not been as much on the possible consequences of his offense, as it has been on attempting to process feelings of utter confusion and frustration about an incident that was such an aberration from how he has lived and conducted himself throughout his 56 years. This incident, occurring less than a year after his hemorrhagic stroke, has left him feeling that his body has betrayed him and that cognitive deficiencies and impairments in impulse control resulting from his stroke, are ultimately going to rob him of all that he has worked so hard to build.

While he was not in my care at the time of the incident and thus, I cannot speak to his cognitive functioning following his stroke, I can speak to the quality of the man that regularly sits before me now. Your Honor, he is a good man. He is a kind man, an honest man, a man who prides himself in his ability to transform relentless hard work, dedication and fair play, into success for himself and the family he adores. He is a man in whom I see values that were made familiar to me through service. It is, therefore, my unreserved belief that it is not in the best interest of Mr. Ajani and Mr. Ajani's family, but more importantly, it is not in the best interest of us, his fellow citizens, to separate him from the society to which he has so richly contributed throughout his life. Thank you for your consideration.

Very Respectfully,

Dr. Hammad S. N'cho, Ph.D.
License Numbers and States: PSY004270 Georgia, 024135 New York
Managing Director/Clinical Psychologist
N'cho Behavioral Group, LLC